UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND SPORTS NETWORK, L.P., <br>     Plaintiff <br><br> v. <br><br> ALLEY INTERACTIVE LLC (CT), <br> ARIEL LEGASSA, and <br> NILDA LEGASSA, <br>     Defendants | ) <br> ) <br> ) <br> ) <br> )     Criminal No.  22-CV-10024-ADB <br> ) <br> ) <br> ) <br> ) <br> ) |

**Motion By Defendants Ariel Legassa and Nilda Legassa
To Dissolve Attachments**

Defendants Ariel Legassa "Legassa" and Nilda Legassa ("Nilda") (collectively the "Defendants") move for an order removing attachments of funds in all bank accounts in their names (the "Accounts"). The court should dissolve the attachments because Plaintiff New England Sports Network, L.P. ("Plaintiff" or "NESN") has not made the showing necessary to obtain the attachments, which include: demonstrating a reasonable likelihood that it will recover judgment in an amount equal or greater to the amount of the attachments *and* establishing a clear danger that Defendants would withdraw, conceal, or dissipate assets.

Even if the court should find that Plaintiff has made both of those required showings, the court should dissolve the attachments pursuant to the Fifth and Sixth Amendments to the United States Constitution because: Plaintiff has not demonstrated that the attached funds are proceeds traceable to the fraud Plaintiff alleges; without access to the attached funds, Defendants are unable to meet their ordinary and necessary living expenses; and Defendant Legassa is unable to retain and pay legal fees to his counsel of choice in a pending criminal case, *United States v.*

*Legassa*, USDC MA Crim. No. 22-mj-04081-DHH, which is based on the same alleged facts that underlie this civil matter (the "Criminal Matter").

## The Attachments

NESN filed its initial complaint on January 7, 2022. *See* Dkt. No. 1 (the "Complaint"). The Complaint named Legassa and Alley Interactive LLC ("Alley CT") as defendants. *Id*.

Along with the Complaint, NESN also filed *ex parte* on January 7, 2022 a Motion For Trustee Process and an accompanying Affidavit re: Motion For Trustee Process. *See* Dkt. Nos. 2 and 3. That motion sought to attach all funds in accounts in Legassa's and defendant Alley CT names at Santander Bank (the "Santander Motion").

On information and belief, the court allowed the Santander Motion and issued Trustee Process on January 10, 2022. NESN served Santander Bank with the motion on January 11, 2022 and Santander attached one account in the name of Alley CT that contained $████.

On information and belief, NESN filed *ex parte* on January 14, 2022 a second Motion For Trustee Process and an accompanying Affidavit re: Motion For Trustee Process. That motion sought to attach all funds in accounts in Legassa's and Alley CT's names at American Broadcast Employee Federal Credit Union (the "Credit Union") (the "First Credit Union Motion").

On information and belief, the court allowed the First Credit Union Motion and issued Trustee Process. NESN served the Credit Union with the motion and the Credit Union attached one account in Legassa's name that contained roughly $████.

On January 19, 2022, NESN filed an amended complaint that named Nilda Legassa as a defendant and brought one count against her and Legassa alleging fraudulent transfer. *See* Dkt. No. 12 (the "Amended Complaint"), Fourth Cause of Action, "Fraudulent Transfer By Defendants Ariel Legassa and Nilda Legassa." Although this cause of action names Nilda, it

alleges only conduct by Legassa. *See Id*., (¶ 53 "Legassa fraudulently transferred at least $80,000;" ¶ 54 "Legassa had" the requisite fraudulent intent; and ¶ 55 Legassa did not receive the "reasonably equivalent value of the property" transferred and lacked assets to pay creditors).

Along with the Amended Complaint, NESN also filed *ex parte* on January 19, 2022 a third Motion For Trustee Process and an accompanying Affidavit re: Motion For Trustee Process. That motion sought to attach all funds in accounts in Nilda's name at the Credit Union (the "Second Credit Union Motion"). On information and belief, the court allowed the Second Credit Union Motion and issued Trustee Process. NESN served the Credit Union with the motion and it attached two accounts in Nilda's name that contained roughly $███.

## Argument

1. **Plaintiff Has Not Shown A Reasonable Likelihood That It Will Recover Judgment In An Amount Equal Or Greater To the Amount Of the Attachments**

    A. **Plaintiff Is Not Reasonably Likely To Recover Judgment Against Nilda**

NESN makes no allegations against Nilda and its fraudulent transfer claim against her is unlikely to succeed. Nilda was not involved in any of the alleged conduct underlying the fraudulent transfer claim. Nilda is employed at ███████ as a Senior Director. Affidavit of Nilda Legassa at ¶ 4, attached hereto as Exhibit 1. She has worked there for 19 years. *Id*. She has a savings and checking account individually at the Credit Union, into which her salary was regularly deposited and from which she paid household bills. *Id*. at ¶ 5. Her husband routinely made deposits into this account to help pay the bills. *Id*. Nilda was never employed by NESN and NESN does not claim that Nilda participated in or was aware of Legassa's alleged conduct while he was a NESN employee. Nor does NESN allege that Nilda had any knowledge of or

involvement with Alley CT.  NESN alleges that Legassa is the principal and a member of Alley CT and it makes no allegations regarding Nilda and Alley CT.  Dkt. 12 at ¶ 16.

Nilda was not involved in Legassa's allegedly fraudulent transfer to her Credit Union account.  NESN claims that Legassa fraudulently received payments from NESN and deposited them into Alley CT's accounts.  *Id*. at ¶¶ 28-30, 35.  After NESN initiated this action, Legassa allegedly transferred at least $80,000 into Nilda's account at the Credit Union to prevent NESN from attaching the funds by trustee process.  *Id*. at ¶¶ 36, 54-55.  NESN does not claim that Nilda participated in the purported transfer or was even aware of it.  It similarly does not allege that Nilda had any intent to defraud NESN or interfere with its ability to attach the funds by trustee process.  NESN has no basis to hold Nilda liable for Legassa's alleged conduct.

      **B.**    **Plaintiff Is Not Reasonably Likely To Recover Judgment Against Legassa**

NESN alleges that Legassa set up defendant Alley CT as straw company for the purpose of receiving payments from NESN for services to be rendered to NESN. NESN further alleges that no services were rendered and NESN received no value in return for the payments it made to Alley CT. NESN alleges that it did not know that Legassa controlled Alley CT or that the payments to Alley CT actually went to Legassa. *See* Amended Complaint at ¶¶ 12-36.

In truth, NESN was not defrauded or deceived. Through its CEO Sean McGrail and CFO Ray Guilbault, NESN agreed to, approved, and knew in advance everything it alleges in the Amended Complaint that Legassa kept from NESN. It knew and agreed that Legassa would establish a vendor company through which he would receive payments for developing direct to

consumer ("DTC") digital capabilities.[1] NESN knew that Legassa would control the vendor and that NESN's payments to the vendor would actually go to Legassa. NESN then approved each invoice submitted by the vendor and issued payments.

The baseless fraud claims NESN now brings are nothing more than an excuse to drive Legassa out of the company right before the launch of the DTC technology. McGrail and Guilbault can now claim credit for and profit from the work Legassa did. By claiming fraud and firing Legassa, McGrail and Guilbault have wrongfully deprived Legassa of profiting from a technology that NESN never could have developed without Legassa at the helm.

Legassa expects that the evidence will show that this unorthodox arrangement that McGrail and Guilbault had approved was the only way that NESN would be able to develop and launch a DTC product on the timetable that NESN's owners had set. NESN's owners directed that NESN develop DTC capability after the 2021 budget process for the digital operations Legassa directed had been approved. McGrail and Guilbault knew that it would be impossible to reopen the budget process and navigate NESN's regular byzantine budget process and still meet an early 2022 DTC launch. They also knew that an on-time launch was critical to the success of the NESN DTC capability. McGrail and Guilbault knew it was now or never and that the arrangement with Legassa was the only way to deliver a new DTC product on time.

Legassa expects that the evidence will further show that he regularly reported to NESN's owners his progress on the NESN DTC project, as well as a companion so-called "white label" DTC technology that could be used not only by NESN, but by any regional sports network or

---

[1]   DTC technology allows a content provider like NESN or HBO (think the HBO MAX application) or anyone else to charge consumers for direct delivery of its content without having to go through a cable provider. A content provider with DTC technology can generate a new revenue stream separate from whatever fees it is able to negotiate from a cable provider like Comcast.

professional team. Legassa, NESN executives, and a representative of NESN ownership attended meetings pitching the white label technology Legassa was developing to other regional sports giants, MSG Network and YES Network, which air games for nearly all of New York's professional sports teams.

Finally, Legassa expects that the evidence will show that NESN and its owners knew that he could deliver. NESN had recruited Legassa from NBC Sports, where he had led creative operations for the NBC Sports Group suite of digital products, including the NBC Sports App, NBCSports.com, and regional sports networks websites and apps. He had previously worked for ESPN in a similar capacity.

When he started at NESN as Vice President Digital in September 2019, Legassa became part of the Senior Leadership Team and reported directly to Guilbault. Legassa was instantly successful at NESN. In 2020, he achieved a major overhaul of NESN's digital world. That required hiring and onboarding NESN's first digital product team, personally managing the development of multiple new digital products, and adding 14 new vendors - all during a pandemic and working half the year remotely. Remarkably, Legassa was able to relaunch NESN's retooled digital platforms within weeks of the original target date, which was a milestone accomplishment. He delivered. He was a star.

There was no real upside to Legassa defrauding NESN in the manner NESN alleges. There was, instead, the very real probability of a devastating downside. Legassa's future was bright. He simply would not jeopardize his sterling professional reputation, put a blemish on his achievements, compromise his integrity, and risk criminal prosecution for obtaining by fraud a few hundred thousand dollars.

    **2.**    **Plaintiff Has Not Demonstrated A Clear Danger That Defendants Would Withdraw, Conceal, Or Dissipate Assets**

*Ex parte* attachment orders "are to be reserved for extraordinary cases." *See Gov't Emps. Ins. Co. v. Big City Chiropractic*, USDC MA Civ. No. 15-13504-MLW (Oct. 9. 2015). *See also Krohn-Hite Corp. v. Berube*, 372 F. Supp. 1262, 1264 (D. Mass. 1974); *Fuentes v. Shevin*, 407 U.S. 67, 82 (1972). This is not such a case. For that reason alone, the court should dissolve the attachments.

The court should dissolve the attachments for the additional reason that even if NESN could show a reasonable likelihood of obtaining judgments against Legassa and/or Nilda, NESN cannot also show a "clear danger" that either defendant would withdraw, conceal, or dissipate the contents of their bank accounts. Both showings are required, and are rooted in Massachusetts attachment law that this court borrows. *See Commercial Printers of Connecticut, Inc. v. Letter-Men Pub. Co.*, 1988 U.S. Dist. LEXIS 3903, at *3 (D. Mass. May 5, 1988) (under Fed. R Civ. P. 64, "the Court is directed to follow the Massachusetts state procedure when considering a motion for trustee process); Mass. R. Civ. P. 4.2(g) ( "[a]n order approving trustee process for a specific amount may be entered *ex parte* upon findings by the court that there is a reasonable likelihood that the plaintiff will recover judgment in an amount equal to or greater than the amount of the trustee process … and that … (ii) there is a clear danger that the defendant if notified in advance of the attachment on trustee process will withdraw the goods or credits from the hands and possession of the trustee and remove them from the state or will conceal them, or (iii) there is immediate danger that the defendant will dissipate the credits, or damage or destroy the goods to be attached on trustee process").

NESN's pleadings utterly fail to demonstrate the requisite clear danger. In the Santander Motion, NESN simply asserts that Alley CT's and Legassa's "pattern of deception poses a clear

danger that they will withdraw funds from the trustee or conceal them if given advance notice of attachment." Dkt. No. 2 at 3. *See also Id.*, at 4-5 ("[b]ased on the foregoing course of conduct, if Defendants had advance notice of NESN's request for attachment by trustee process, they would withdraw funds or credits from the possession of the trustee and/or conceal or dissipate the funds to frustrate NESN's collection rights").

In the First and Second Credit Union Motions, NESN does not even pay lip service to establishing the clear danger requirement. In the First Credit Union Motion, NESN simply incorporates the Santander Motion. It does the same in the Second Credit Union Motion, but adds an allegation that NESN believes that "after the commencement of this action, Legassa "fraudulently transferred assets from his account to one held exclusively in the name of his wife." Second Credit Union Motion at 2. What NESN does not say is that this transfer occurred before any accounts at the Credit Union had been attached, NESN had not even served Legassa with a summons notifying him of NESN's suit, it was entirely lawful for Legassa to make the transfer, and the money transferred was not proceeds of or traceable to the alleged fraud. *See* Dkt. Nos. 18-20.

Conclusory allegations like those made by NESN here – which simply bootstrap the "pattern of deception" or "foregoing course of conduct" alleged in the Amended Complaint - do not establish the requisite clear danger. Judge Wolf held in *Gov't Emps. Ins. Co.*, *supra*, that "a bare assertion that the adverse party will dispose of assets or evidence is insufficient." *See also First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993) (same). Judge Wolf explained that "the moving party must show that the adverse party, or parties similarly situated, have a history of doing so." *Gov't Emps. Ins. Co.*, *supra*. A party's assertion "that because the defendants have allegedly engaged in fraud and deceit, they are likely to destroy evidence and

hide assets … is insufficient to justify an *ex parte* temporary restraining order or trustee process order." *See also Chase v. Merson*, Civ. No. 18-CV-00165-NT (D. ME June 1, 2018) ("plaintiff fails to set forth specific facts demonstrating a 'clear danger' that any of the defendants will make property unavailable if notified in advance of his bid to attach it. Instead, he relies on the presupposition that past is prologue, contending that, because the defendants defrauded him, … the defendants can be expected … to make their property unavailable to be attached. As this court has previously held, assumptions of this kind are too thin a reed on which to predicate an *ex parte* attachment") (collecting cases) (footnote omitted).

### 3. The Court Should Dissolve the Attachments Because Defendants Need the Attached Funds To Pay Ordinary and Necessary Living Expenses and Attorneys Fees In the Criminal Matter

If the court were to find that the attachments were properly issued despite all of the shortcomings set forth above, the court should still dissolve the attachments pursuant to the Fifth and Sixth Amendments to the United States Constitution because without the attached funds, the defendants lack adequate resources to pay ordinary and necessary living expenses or to pay legal fees for counsel of Legassa's choice in the Criminal Matter.

Defendants have an immediate and critical need to access the attached funds. NESN fired Legassa on January 6, 2022. *See* Amended Complaint at ¶ 34. He presently has no income. It is unlikely that he will be able to find a job in his field. A press release issued by the United States Attorney's Office announcing Legassa's arrest has resulted in widespread reporting of the criminal charges. The allegations in NESN's Amended Complaint have also has been reported extensively.

Although Legassa has no current income, the costs of providing for his family and meeting their needs continue apace. Defendants' reasonable and necessary monthly expenses,

including mortgage payments, utilities, food, insurance, transportation costs, and tuition for their children, far exceed the income Nilda continues to earn. *See* Affidavit of Ariel Legassa, at ¶¶ 4-7, attached as Exhibit 2; Ex. 1, Aff. of Nilda Legassa at ¶¶ 5-9. Defendants have no other available resources. *Id*. Ex. 2 at ¶ 8; Ex. 1 at ¶ 9. Access to the attached funds is, for these reasons, crucial.

In the criminal context where the government attempts to freeze a defendant's assets, courts routinely recognize that paying for ordinary and necessary living expenses until the conclusion of the case is of "paramount importance" and that depriving a defendant from meeting living expenses would implicate a defendant's right to Due Process.  *See United States v. Jones*, 160 F.3d 641, 646 (10th Cir. 1998) ("a restraining order that prevents a defendant from supporting herself and her family pending and during trial would likely work an injustice with constitutional implications"); *United States v. Thier*, 801 F.2d 1463, 1477 (5th Cir. 1986) (Rubin, J., concurring) (suggesting that such a result "shocks the judicial conscience").

Freezing assets in a civil case that are necessary to pay for legal representation in a companion criminal case implicates a defendant's Sixth Amendment right to the assistance of counsel of choice. *See Luis v. United States*, 136 S.Ct. 1083, 1088, (2016) ("the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment."); *Id*. at 1096 (Thomas, J., concurring) ("I agree with the plurality that a pretrial freeze of untainted assets violates a criminal defendant's Sixth Amendment right to counsel of choice").

When an asset freeze is imposed in a civil case, "the Sixth Amendment right to counsel of choice requires courts to be more permissive in unfreezing assets" to retain counsel in a companion criminal case. *See SEC v. Santillo*, USDC SDNY Civil No. 15-cv-5491 at 14 (SDNY

July 11, 2018) (citation omitted); *SEC v. Coates*, SDNY Civil No. 94 civ 5361 (SDNY Aug 23, 1994) ("Although a court may impose an asset freeze in a civil case, notwithstanding a companion criminal case, these circumstances dictate that the court pay particular attention to the defendant's Fifth and Sixth Amendment rights").

To maintain a freeze of assets in a civil case, the party seeking the freeze must make "a showing that the frozen assets are traceable to fraud." *See SEC v. FTC Capital Markets*, USDC SDNY Civil No. 09-CV-4755 (SDNY June 10, 2010) (allowing defendant's motion to release funds in an amount sufficient to hire counsel of her choice in a companion criminal case). The court derived this standard from *United States v. Monsanto*, 491 U.S. 600, 615 (1989), as adapted and applied in the civil context by the court in *Coates*, *supra*. Upon defendant's showing that "without advancement of the frozen funds, she will be unable to pay defense counsel's fees" in a companion criminal prosecution, "the Commission is required to demonstrate that that the frozen funds are traceable to fraud." *FTC Cap. Markets*, *supra*, at 12-13. Frozen funds are "traceable to fraud" when they are "the proceeds of fraud." *Id*. at 11; *Santillo*, *supra* at 14 ("Funds are traceable to fraud when they are 'the proceeds of fraud'") (citation omitted).

On information and belief, NESN has made no showing that the funds in the various accounts that it has attached are the proceeds of the Defendants' alleged fraud. The flow of funds as alleged in the Amended Complaint is from NESN to Alley CT's Santander account. *See* Amended Complaint at 22-28. Defendants are aware of no showing by NESN that funds into the Alley CT account were transferred out to any account in Legassa's or Nilda's name, including the accounts in their names that NESN has been permitted to attach at the Credit Union.

Even if NESN could show that funds were transferred from the Alley CT account to one or more Credit Union accounts in Legassa's name, it can make no showing that those funds were

then transferred to one or more of Nilda's accounts. Legassa's NESN salary and bonuses were regularly direct deposited into his Credit Union account. *See* Ex. 2, Legassa Aff. at ¶ 9. During the March 2021 through January 5, 2022 period that NESN alleges it was defrauded by Legassa, NESN direct deposited a total of $[redacted] in salary payments into the x750 account. NESN direct deposited an additional $[redacted] into that account in January and February 2021 and January 2022. NESN has not and cannot show that any transfers from Legassa's account to his wife's account, had they occurred, were not transfers of the $[redacted] in legitimate NESN wages he received.

There can be no dispute that Nilda's salary from her employer cannot possibly be the proceeds of fraud alleged by her husband. Her salary was direct deposited into her Credit Union account and has now been attached. *See* Exhibit 1, Aff. of Nilda Legassa at ¶¶ 5-6. Nilda's salary from her employer was regularly direct deposited into her Credit Union account that NESN was permitted to attach.

For these reasons, even if NESN could establish transfers from Legassa's Credit Union accounts to Nilda's, it cannot show that any part of the contents of Nilda's accounts at the time the attachments were obtained were the proceeds of the fraud NESN alleges.

Assuming arguendo that NESN could show that Nilda's account contained proceeds of the alleged fraud, any attachment of her account should be limited to the funds, if any, that NESN can show were fraudulently transferred. NESN attached Nilda's Credit Union account in its entirety. However, to succeed on its fraudulent transfer claim, NESN must show that Legassa made a transfer to Nilda with "actual intent to hinder, delay, or defraud" it. Mass. Gen. Law. Ch. 109A, § 5(a)(1). If the court declines to dissolve the attachment in full, then it should limit any attachment of Nilda's accounts to those funds, if any, that NESN alleges, with the specificity

required for fraud claims by Rule 9(b), were transferred by Legassa with "actual intent to hinder, delay, or defraud" it and which are directly traceable to the fraud. *Id.*

## Conclusion

For all of the foregoing reasons, the court should enter an order immediately dissolving all attachments of all Credit Union accounts in Defendants' names.

## Certificate of Compliance With Local Rule 7.1(a)(2)

Undersigned counsel hereby certifies that he has conferred with Plaintiff's Counsel and has attempted in good faith to resolve or narrow the issues presented in this motion. The issues set forth above remain unresolved.

## Request For Hearing

Defendants request a hearing on this motion at the court's earliest convenience.


Respectfully submitted,

| NILDA LEGASSA | ARIEL LEGASSA |
| --- | --- |
| By her attorneys, | by his attorney |
| | |
| /s/ Christina N. Lindberg | /s/ *E. Peter Parker* |
| Tracy A. Miner (BBO No. 547137) | E. Peter Parker |
| Christina N. Lindberg (BBO No. 690443) | B.B.O. #552720 |
| Miner Siddall LLP | Law Office of E. Peter Parker |
| 101 Federal Street, Suite 650 | The Wheelhouse at Bradford Mill |
| Boston, MA 02110 | Concord, MA  01742 |
| Tel.: (617) 202-5890 | (617) 742-9099 |
| tminer@msdefenders.com | peter@parkerslaw.com |
| clindberg@msdefenders.com | |

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 22, 2022

/s/ *E. Peter Parker*
E. Peter Parker