UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NEW ENGLAND SPORTS | ) | |
| NETWORK, L.P., | ) | |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | Criminal No.   22-CV-10024-ADB |
| | ) | |
| ALLEY INTERACTIVE LLC (CT) | ) | |
| NILDA LEGASSA, | ) | |
|     Defendants and | ) | |
| ARIEL LEGASSA, | ) | |
|     Defendant and Plaintiff | ) | |
|     in Counterclaim | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NEW ENGLAND SPORTS | ) | |
| NETWORK, L.P., | ) | |
| SEAN McGRAIL, and | ) | |
| RAY GUILBAULT | ) | |
|     Defendants in | ) | |
|     Counterclaim | ) | |

**Answer Of Defendants Ariel Legassa and Alley Interactive LLC**
**To Plaintiff's First Amended Complaint and Jury Demand**
**and Counterclaim Of Defendant Ariel Legassa**

Defendants Ariel Legassa ("Legassa") and Alley Interactive LLC ("Alley CT")

(collectively "Defendants") respond to each numbered paragraph of Plaintiff's First Amended

Complaint For Fraud, Conversion, Unfair and Deceptive Business Practices, and Fraudulent

Transfer (the "Complaint") brought by Plaintiff New England Sports Network L.P. ("NESN")

and assert the following affirmative defenses. Legassa asserts the following counterclaim.

**Answer**

1. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations.

2. Admitted as to first and third sentences. Defendants also admit that Legassa was one of several persons at NESN who were responsible for approving payments to vendors for work on projects for NESN.

3. Defendants deny the characterization that Legassa "manufactured" at least 11 invoices and admit that he was one of several persons at NESN who approved payment of the invoices to Alley CT. Defendants otherwise admit the allegations in this paragraph.

4. Denied.

**Parties**

5. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations.

6. Admitted.

7. Admitted.

8. Admitted.

**Jurisdiction and Venue**

9. This paragraph sets forth a legal conclusion to which no response is required. Defendants deny the allegations in this paragraph to the extent a response is required.

10. This paragraph sets forth a legal conclusion to which no response is required. Defendants deny the allegations in this paragraph to the extent a response is required.

11. This paragraph sets forth a legal conclusion to which no response is required.

Defendants deny the allegations in this paragraph to the extent a response is required.

**Alleged Factual Background**

12. Defendants admit that NESN is a regional sports network, otherwise denied.

13. Defendants admit that Legassa was one of several persons at NESN who approved

payment for services provided by vendors and otherwise admit the allegations in this

paragraph.

14. Admitted.

15. No response is required as the document referenced in this paragraph and attached to

the Complaint speaks for itself. Defendants deny the allegations in this paragraph to

the extent a response is required.

16. No response is required as the files referenced in this paragraph speak for themselves.

Defendants deny the allegations in this paragraph to the extent a response is required.

17. No response is required as the files referenced in this paragraph speak for themselves.

Defendants deny the allegations in this paragraph to the extent a response is required.

18. Defendants admit the first sentence of this paragraph. Defendants are without

knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in this paragraph, and therefore deny the allegations.

19. Defendants admit that Alley CT was incorporated and that Legassa finalized a

contract between NESN and Alley NY and otherwise deny the allegations in this

paragraph.

20. No response is required as the document referenced in this paragraph and attached to the Complaint speaks for itself.  Defendants deny the allegations in this paragraph to the extent a response is required.

21. Admitted as to first sentence. Defendants admit that Legassa sent Alley CT invoices to NESN and denies the remaining allegations in this paragraph.

22. No response is required as the document referenced in this paragraph and attached to the Complaint speaks for itself.  Defendants deny the allegations in this paragraph to the extent a response is required.

23. No response is required as the document referenced in this paragraph and attached to the Complaint speaks for itself.  Defendants deny the allegations in this paragraph to the extent a response is required.

24. No response is required as the document referenced in this paragraph and attached to the Complaint speaks for itself.  Defendants deny the allegations in this paragraph to the extent a response is required.

25. Defendants deny that Legassa made any misrepresentations to NESN. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph about what NESN did, and therefore deny the allegations. No further response is required as the document referenced and quoted from in this paragraph and attached to the Complaint speaks for itself.  Defendants deny the allegations in this paragraph to the extent a further response is required.

26. Defendants admit that Legassa was one of several persons at NESN who were responsible for approving payments to vendors for work on projects for NESN and otherwise admit the allegations in this paragraph.

27. No response is required as the documents referenced in this paragraph and attached to the Complaint speak for themselves. Defendants deny the allegations in this paragraph to the extent a response is required.

28. Defendants admit that Legassa was one of several persons at NESN who approved payment of invoices from Alley CT. To the extent that this paragraph references documents attached to the Complaint, the documents speak for themselves. Defendants deny the allegations in this paragraph to the extent a further response is required.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of this paragraph and therefore deny the allegations.

29. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations.

30. Defendants deny that NESN received no benefit or services in exchange for payment to Alley CT and are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and therefore deny the allegations.

31. Defendants admit that Legassa said that Alley CT was created by him and that it had no relation to Alley NY and otherwise deny the allegations in this paragraph.

32. Denied.

33. Defendants admit that Legassa was a NESN executive and that he was one of several persons whose approval was required to approve vendor invoices. Defendants deny the remaining allegations in this paragraph.

34. Admitted.

35. Admitted.

36. Denied.

## First Cause of Action

37. Defendants repeat and incorporate their responses to each and every allegation set forth in the preceding paragraphs, as though fully set forth here.

38. Denied.

39. Denied.

40. Denied.

41. Denied.

42. Denied.

## Second Cause of Action

43. Defendants repeat and incorporate their responses to each and every allegation set forth in the preceding paragraphs, as though fully set forth here.

44. Denied.

45. Denied.

46. Denied.

47. Denied.

**Third Cause of Action**

48. Defendant Alley CT repeats and incorporates its responses to each and every allegation set forth in the preceding paragraphs, as though fully set forth herein.

49. Denied.

50. Denied.

51. Denied.

**Fourth Cause of Action**

52. Defendant Legassa repeats and incorporates his responses to each and every allegation set forth in the preceding paragraphs, as though fully set forth here.

53. Denied.

54. Denied.

55. Denied.

**First Affirmative Defense**

The Complaint fails to state any claim upon which relief may be granted.

**Second Affirmative Defense**

The Complaint fails to plead fraud with sufficient particularity.

**Third Affirmative Defense**

The Complaint is barred is barred by the doctrine of equitable estoppel. Plaintiff knew of and approved the relationship between NESN and Alley CT and approved all payments to Alley CT.

**Fourth Affirmative Defense**

The Complaint is barred is barred by the doctrine of waiver. Plaintiff knew of and approved the relationship between NESN and Alley CT and approved all payments to Alley CT.

**Fifth Affirmative Defense**

The Complaint is barred is barred by the doctrine of consent. Plaintiff knew of and approved the relationship between NESN and Alley CT and approved all payments to Alley CT.

**Sixth Affirmative Defense**

The Complaint is barred by the doctrine of unclean hands. Plaintiff knew of and approved the relationship between NESN and Alley CT and approved all payments to Alley CT and now disavows that approval for an improper purpose.

**Seventh Affirmative Defense**

Plaintiff's claimed damages are offset by the value of services it received from Alley CT. Plaintiff knew of and approved the relationship between NESN and Alley CT and approved all payments to Alley CT.

**Jury Demand**

Defendant demands a trial by jury on all matters so triable.

**Defendant Ariel Legassa's Counterclaim To Plaintiff's First Amended Complaint and Jury Demand**

Defendant Ariel Legassa ("Legassa") brings this counterclaim against the Defendants in Counterclaim New England Sports Network, L.P., Sean McGrail, and Ray Guilbault (collectively the "Counterclaim Defendants") based on: wrongful termination in violation of public policy

and/or with the intent to benefit financially at Legassa's expense; violation of Legassa's civil rights by terminating his employment based on membership in a protected racial class and/or creating a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964 and M.G.L. c. 151B; abuse of process; and/or intentional or negligent infliction of emotional distress (the "Counterclaim").

## Parties

1. Ariel Legassa is an individual who lives in Burlington, Connecticut.

2. New England Sports Network, L.P. ("NESN") is a Massachusetts limited partnership located at 480 Arsenal Way, Building #1, Watertown, MA 02472.

3. Sean McGrail ("McGrail") is an individual who lives in Hopkinton, Massachusetts. At all times relevant to this counterclaim, McGrail was the CEO of NESN.

4. Ray Guilbault ("Guilbault") is an individual who resides in Quincy, Massachusetts. At all times relevant to this counterclaim, Guilbault was the CFO/COO of NESN.

## Jurisdiction

5. This court has jurisdiction over the parties pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.

6. This court has personal jurisdiction over the Counterclaim Defendants under Fed. R. Civ. P. 4 and under M.G.L. c. 223A §§ 1-3 because they reside in Massachusetts and/or committed the alleged tortious acts in Massachusetts.

7. Venue is proper in this court pursuant to 28 U.S.C. § 1291(b)(1) and (2) because the Counterclaim Defendants reside in this district and/or because a substantial part of the events or omissions giving rise to the counterclaims occurred in this district.

**Facts**

8. In 2019, Legassa was employed by NBC Sports as Creative Director. Legassa led creative operations for the NBC Sports Group suite of digital products. Legassa headed the ideation and process team, developed digital products, and managed client relationships. In 2019, NESN was looking to hire a Vice President, Digital. The VP Digital would report directly to the COO and CFO and become part of the senior leadership team. The VP Digital would oversee all of NESN's digital media activities, integrating digital content production, and developing NESN's future digital offerings across all platforms.

9. NESN engaged an executive search firm and recruited Legassa. On September 13, 2019, NESN offered the VP Digital position to Legassa. Legassa accepted the offer and started at NESN on September 30, 2019. He would report to Guilbault, NESN's COO/CFO.

10. Legassa's tasks were to completely overhaul and re-launch NESN's digital capabilities. He was responsible for developing a brand new digital product line that included a new NESN website, a new customizable video viewing application, and the integration of NESN with Apple TV and Roku.

11. Legassa had to essentially start from scratch. Guilbault conceded that NESN did not understand the scope and the scale of the digital product relaunch. It had no internal

digital technology team and its only two web developers left a few months after Legassa was hired. Legassa had to hire and onboard NESN's first digital product team - six members with the technological skills necessary to achieve NESN's digital goals for 2020.

12. NESN also lacked relationships with outside technology vendors. Legassa had to add 14 new technology vendors that would also be necessary to accomplish NESN's digital goals for 2020.

13. Under Legassa's leadership, NESN's new website, application, and Apple TV/Roku integration launched in less that a year, and within a few weeks of the targeted launch date. Legassa had achieved a major overhaul of NESN's entire digital world. He did it during the height of the COVID-19 pandemic. Guilbault called Legassa's achievements impressive, unprecedented, and a milestone accomplishment.

14. Following the remarkable launch of NESN's new digital suite in August 2020, NESN began the budget process for 2021. This was a belabored and painstakingly slow process, partly because of financial controls put in following an accounting issue identified in 2017 that had resulted in NESN overstating revenues. Among the changes that were implemented then was a requirement that the legal department of NESN's majority owner, Fenway Sports Group ("FSG"), review and approve all budget requests and all contracts with all new vendors.

15. FSG's contract approval process was also very slow. In order to have any hope of launching NESN's 2020 website, application, and Apple TV/Roku integration on time, Legassa had to work with the fourteen new vendors he had engaged without

contracts for up to six to eight months. McGrail and Guilbault knew about and approved these arrangements, which skirted NESN policies and procedures. McGrail and Guilbault approved of working with digital vendors without contracts because they knew that this was the only way that NESN's digital relaunch could occur on time.

16. McGrail and Guilbault approved payments of invoices submitted by these vendors despite the lack of contracts and non-compliance with NESN policies and procedures.

17. Legassa's digital department was not the only department for which McGrail and Guilbault authorized vendor relationships and payments to vendors even though contracts were not in place. During Legassa's tenure at NESN, McGrail and Guilbault authorized the Engineering, Sales, Operations, and Production and Programming departments to work with vendors without contracts, and approved payments to those vendors, in violation of NESN policies and procedures.

18. NESN's 2021 digital budget included two projects - NESN Bets and NESN Watch. NESN Bets was a digital platform for taking sports bets. The Counterclaim Defendants considered it the number one financial opportunity for the company in 2021. The Counterclaim Defendants looked forward to Legassa taking the wheel to drive NESN's digital projects and developing the path forward to NESN Bets. The Counterclaim Defendants counted on Legassa to lead NESN into the betting space with a clear content strategy and digital operations plan.

19. NESN Watch was a video streaming platform that could learn from selections made by the viewer and make suggestions about other content in which the viewer might be interested.

20. With the 2021 digital budget set for the development and launch of NESN Bets and NESN Watch, Legassa's plate was full. His tasks became more difficult as, one after the other, top management at NESN units whose participation was critical to the success of the new digital products, left NESN. During the first few months of 2021, the head of marketing, the head of engineering, and the head of production and programming all left NESN. The Counterclaim Defendants expected Legassa to pick up a lot of the slack.

21. In early 2021, NESN's owners added two additional massive digital projects to the two already budgeted. Legassa was told that in addition to NESN Bets and NESN Watch, the owners expected that NESN would develop in 2021 and launch by the Spring of 2022 two additional digital products - 4K and direct to consumer ("DTC") streaming capability.

22. DTC technology allows a content provider like NESN to charge consumers for direct delivery of its content through an application without having a subscription with a cable provider like Comcast. A content provider with DTC technology can generate a new revenue stream separate from whatever fees it is able to negotiate from a cable provider like Comcast, and would not have to rely solely on the cable provider for customer access and revenue.

23. Counterclaim Defendants knew that it would be impossible for NESN to go through the formal budgeting process to get approval for developing the technology necessary for DTC capability in time to launch on the owners' Spring 2022 timetable. The Counterclaim Defendants previously had agreed to, approved, and authorized payments to vendors who did not have contracts because it was necessary to launch NESN's new 2020 digital suite on time. They knew that they would again have to find a work-around in order to develop and launch a DTC product on the Spring 2022 timetable that NESN's owners had set. They also knew that an on-time launch was critical to the success of the NESN DTC product in a very competitive marketplace.

24. Counterclaim Defendants also knew that NESN had no hope of developing and launching a DTC product on the owners' timetable without Legassa at the helm. They knew that they would have to compensate Legassa appropriately, and they knew that an appropriate raise would not be approved by ownership.

25. Counterclaim Defendants agreed that Legassa would establish a vendor company through which he would receive payments for developing the DTC product.

26. Counterclaim Defendants knew that Legassa would control the vendor and that payments from NESN to the vendor would actually go to Legassa.

27. Pursuant to this agreement with Counterclaim Defendants, and with their full knowledge and approval, Legassa set up Alley Interactive LLC as a Connecticut limited liability company ("Alley CT") for the purpose of receiving payments from NESN.

28. Pursuant to this agreement between Legassa and Counterclaim Defendants, and with the Counterclaim Defendants' full knowledge and approval, Alley CT invoices were processed in the ordinary course and approved up the management chain at NESN. Payments were issued to Alley CT with full knowledge by the Counterclaim Defendants that the money would go to Legassa for developing DTC capability.

29. Legassa regularly reported to NESN's owners his progress on the DTC project.

30. Alongside the development of DTC technology that would allow NESN to to develop an application for streaming its own conduct, Legassa was also developing a companion so-called "white label" DTC technology that could be used not only by NESN, but by any regional sports network or professional team.

31. Legassa, NESN executives, and a representative of NESN ownership attended meetings pitching the white label technology Legassa was developing to other regional sports giants, MSG Network and YES Network, which air games for nearly all of New York's professional sports teams.

32. The white label product Legassa was developing would fill a void in the DTC technology field. The two biggest players that had provided the technology, BAMTech LLC and Playmaker Media, had been acquired by ESPN/Disney and NBC, respectively. Legassa envisioned developing a universal DTC technology that would allow any content provider to stream direct to consumer.

33. A white label universal DTC application would be incredibly lucrative. BAMTech was valued at $3.75 billion when Disney began acquiring an ownership position in 2017. Legassa envisioned that a white label DTC product would become part of FSG.

Legassa reasonably believed that he would benefit financially from the success of the white label product he was developing.

34. On January 6, 2022, Counterclaim Defendants, acting in concert, and acting in bad faith, fired Legassa, falsely claiming that he had concealed the nature of Alley CT and had defrauded NESN into making payments that secretly went to Legassa.

35. In truth, Counterclaim Defendants had agreed in advance that Legassa would establish a vendor company that he would control, and that Legassa would be paid through the vendor for developing DTC digital capabilities. Counterclaim Defendants approved Alley CT as a vendor and approved and made payments to Alley CT, knowing and intending that the money would go to Legassa as compensation for his development of DTC technology.

36. Legassa's termination is an effort by Counterclaim Defendants to get rid of Legassa before the launch of NESN's DTC technology and before Legassa could finish developing the white label DTC product and share in the profits from it.

37. By terminating Legassa'a employment, McGrail and Guilbault can now claim credit for and profit from the work Legassa did. They have wrongfully deprived Legassa of profiting from a technology that NESN never could have developed without his ideas, vendor relationships, vision, and efforts.

38. As a Latino, Legassa is a member of a protected class. The work environment and culture created by the Counterclaim Defendants was uncomfortable for Legassa and other non-white employees who were members of a protected class because of their races.

39. McGrail regularly told inappropriate racist jokes. He attempted to temper or excuse himself for the jokes by noting that he was Irish, which was itself a racially stereotypical and derogatory slur.

40. Guilbault occasionally told inappropriate racist jokes. He made no attempt to temper or excuse himself for his jokes.

41. In 2020, Legassa, the Vice President of Production and Programming, and the Vice President of Human Resources all supported and sought the promotion of a particular employee, on-air talent who was African American. Over a period of many months, the three Vice Presidents vigorously urged McGrail and Guilbault to make the promotion. They never did.

42. At one point during Legassa's efforts to effectuate the promotion, Guilbault said that the employee was not one of us, which Legassa understood as a tacit admission that the promotion would not happen because the employee was African American.

43. The employee was not promoted and quit NESN. On information and belief, the Counterclaim Defendants' refusal to promote the African American employee and the racially intolerant culture that the Counterclaim Defendants perpetuated at NESN led to an internal investigation by an outside law firm. Lawyers from the firm interviewed NESN employees and management. On information and belief, this investigation identified other instances of inappropriate treatment of members of protected classes and a general discomfort among members of those classes with the workplace environment. On information and belief, the law firm provided NESN with a report.

44. Following the completion of the investigation by the law firm, NESN brought in a series of consultants. The first consultant specialized in addressing and improving culture, diversity, equity, and inclusion awareness. The consultant conducted racial sensitivity and diversity training. The three other consultants NESN brought in also focused on improving the corporate culture at NESN.

45. Even though he was a member of the senior management team, Legassa never really felt like he belonged as a Latino at NESN because of, among other things, the racially insensitive environment at NESN, the racially inappropriate things that McGrail said regularly and that Guilbault said occasionally, and the inability to get a deserving African American employee a promotion that senior management unanimously and energetically backed.

46. McGrail drove home to Legassa that as a Latino, he was not like the rest of the people at NESN. McGrail regularly joked to Legassa about or made reference to the way that Latino people would do things, and would comment that it was different from the way "we" do things.

47. McGrail once scathingly ridiculed anyone who would get a tattoo and stated that if his child ever did that, he would cut the child from his will. Legassa, like many other members of protected classes, has several tattoos that carry cultural and ethnic meaning. As a result of McGrail's expressed vitriol, Legassa was careful to be sure that his clothing always concealed his tattoos.

**Count One**
**Wrongful Termination**

48. Legassa repeats and incorporates each and every allegation set forth in the preceding paragraphs, as though fully set forth here.

49. On January 6, 2021, Counterclaim Defendants, acting in concert, wrongfully terminated Legassa's employment in violation of public policy.

50. The Counterclaim Defendants, acting in concert, wrongfully terminated Legassa in bad faith and with the intent to benefit financially at Legassa's expense.

51. As a direct and proximate result of the conduct of the Counterclaim Defendants described in this Counterclaim, Legassa has suffered and continues to suffer financial damages, and damage to his reputation, his ability to obtain employment, and his emotional well being.

**Count Two**
**Violation Of Legassa's Civil Rights, Title VII of the**
**Civil Rights Act of 1964, 42 U.S.C. § 2000e,**
**and M.G.L. c. 151B[1]**

52. Legassa repeats and incorporates each and every allegation set forth in the preceding paragraphs, as though fully set forth here.

53. Legassa is Latino. He is a member of a protected racial class.

---

[1]     Legassa realizes that there are administrative presentment requirements that should be satisfied before a party files an employment discrimination claim in a court, like the counterclaims he brings in Counts Two and Three here. However, Legassa is also required to plead now, at the time of his answer, all compulsory counterclaims that arise out of the transaction or occurrence that is the subject matter of the opposing party's claim. *See* Fed. R. Civ. P. 13(1)(A). As Legassa's civil rights claims arguably arise from the termination of his employment by NESN, which NESN claims is justified, Legassa arguably must bring them now. Legassa is simultaneously making the requisite administrative claims with the appropriate agencies.

54. Legassa performed his job at NESN at more than an acceptable level.

55. Legassa was terminated.

56. On information and belief, NESN seeks to fill his position by hiring someone with qualifications similar to Legassa's.

57. The Counterclaim Defendants, acting in concert, terminated Legassa's employment based upon his membership in a protected class, specifically, his race.

58. The Counterclaim Defendants, acting in concert, violated Legassa's constitutional rights by terminating him because of his membership in a protected class, specifically his race.

59. As a direct and proximate result of the Counterclaim Defendants' racially-based termination of Legassa and the violation of his constitutionally-protected civil rights, Legassa has suffered and continues to suffer damages including, without limitation, financial damages, damage to his reputation, to his ability to obtain employment, to his ability to earn a living, and to his emotional well being.

**Count Three**
**Hostile Work Environment In Violation Of Legassa's Civil Rights,**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,**
**and M.G.L. c. 151B**

60. Legassa repeats and incorporates each and every allegation set forth in the preceding paragraphs, as though fully set forth here.

61. The Counterclaim Defendants, acting in concert, created and perpetuated a workplace permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive enough to alter the conditions of Legassa's employment and the

employment of members of other protected classes, and to create an abusive working environment.

62. The Counterclaim Defendants, acting in concert, engaged in, and/or permitted, harassment or other abusive, offensive, or humiliating conduct which was sufficiently severe and pervasive so as to interfere with a reasonable person's work performance.

63. The conduct of the Counterclaim Defendants violated Legassa's constitutional rights and his rights under the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and M.G.L. c. 151B.

64. As a direct and proximate result of the conduct of the Counterclaim Defendants, Legassa has suffered and continues to suffer damages including, without limitation, financial damages, damage to his reputation, to his ability to obtain employment, to his ability to earn a living, and to his emotional well being.

**Count Four**
**Abuse Of Process**

65. Legassa repeats and incorporates each and every allegation set forth in the preceding paragraphs, as though fully set forth here.

66. NESN's law suit against Legassa, and its subsequent acts of obtaining attachments on a joint bank account he maintains with his wife and a bank account solely in his wife's name, adding a baseless fraudulent transfer claim against his wife, refusing to dissolve the attachments and, on information and belief, causing the Legassa to be charged criminally, constitute an unlawful use and/or abuse of process that: (a) seeks an ulterior or illegitimate purpose, which has caused Legassa to sustain damages; and/

or (b) is intended to coerce and obtain a collateral advantage not properly involved in that law suit.

67. As a direct and proximate result of the conduct of the Counterclaim Defendants described in this Counterclaim, Legassa has suffered and continues to suffer damages including, without limitation, financial damages, damage to his reputation, to his ability to obtain employment, to his ability to earn a living, and emotional distress.

**Count Five**
**Intentional Infliction Of Emotional Distress**

68. Legassa repeats and incorporates each and every allegation set forth in the preceding paragraphs, as though fully set forth here.

69. By engaging in all of the conduct described in this Counterclaim, the Counterclaim Defendants' intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of their conduct.

70. All of the conduct of the Counterclaim Defendants' described in this Counterclaim was extreme and outrageous.

71. All of the conduct of the Counterclaim Defendants' described in this Counterclaim was the cause of Legassa's emotional distress.

72. Legassa's emotional distress was and is severe.

**Count Six**
**Negligent Infliction Of Emotional Distress**

73. Legassa repeats and incorporates each and every allegation set forth in the preceding paragraphs, as though fully set forth here.

74. The Counterclaim Defendants owed Legassa a duty of care not to wrongfully terminate him in violation of public policy or in bad faith and with the intent to benefit financially at his expense, and/or because of his membership in a protected racial class, not to create and perpetuate a hostile work environment, and not to engage in abuse of process/malicious prosecution, all as described in this Counterclaim.

75. The Counterclaim Defendants breached that duty by engaging in all of the wrongful conduct described in this Counterclaim.

76. By engaging in all of the conduct described in this Counterclaim, the Counterclaim Defendants' were, at a minimum, negligent.

77. As a direct and proximate result of the conduct of the Counterclaim Defendants described in this Counterclaim, Legassa has suffered and continues to suffer emotional distress and physical harm manifested by objective symptomatology.

78. A reasonable person would have suffered emotional distress under the same circumstances.

**Prayer For Relief**

WHEREFORE, Plaintiff in Counterclaim Legassa requests that the court order relief as follows:

Grant Plaintiff in Counterclaim damages in an amount to be determined at trial;

Award Plaintiff in Counterclaim attorneys fees plus reasonable costs and expenses incurred in this action; and

Grant Plaintiff in Counterclaim all other further relief, legal and equitable, that this court deems proper.

### Jury Demand

Plaintiff in Counterclaim demands a trial by jury on all matters so triable.

ARIEL LEGASSA,
ALLEY INTERACTIVE, LLC
 By their attorney,

/s/ *E. Peter Parker*
E. Peter Parker
 B.B.O. #552720
Law Office of E. Peter Parker
The Wheelhouse at Bradford Mill
Concord, MA  01742
(617) 742-9099
peter@parkerslaw.com

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 4, 2022.

/s/ *E. Peter Parker*
E. Peter Parker