UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND SPORTS NETWORK, L.P.,<br><br>Plaintiff,<br><br>v.<br><br>ALLEY INTERACTIVE LLC (CT), NILDA LEGASSA,<br><br>Defendants, and<br><br>ARIEL LEGASSA,<br><br>Defendant and Counterclaim Plaintiff,<br><br>v.<br><br>NEW ENGLAND SPORTS NETWORK, L.P., SEAN McGRAIL, RAY GUILBAULT,<br><br>Counterclaim Defendants. | Civil Action No. 22-CV-10024-ADB |

**COUNTERCLAIM DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS DEFENDANT ARIEL LEGASSA'S COUNTERCLAIMS AND SPECIAL MOTION TO DISMISS DEFENDANT LEGASSA'S ABUSE OF PROCESS COUNTERCLAIM UNDER M.G.L. CH. 231 § 59H**

Defendant Ariel Legassa ("Legassa") was caught embezzling at least $575,000 from his former employer, Plaintiff New England Sports Network, L.P. ("NESN"). NESN sued him, and he was later indicted by a federal grand jury. In a desperate attempt to deflect blame onto others, Legassa brought six counterclaims against NESN and two of its executives. Legassa's counterclaims are a hodgepodge of imagined opportunities to privately benefit from his work on NESN's behalf, perceived slights, and fabricated excuses about his termination. Each counterclaim is categorically false and lacks any good faith basis. This Court should dismiss all

of Legassa's counterclaims, as they are either untimely, preempted, or inadequately pleaded. The Court should further award NESN attorneys' fees on its special motion to dismiss under Massachusetts' anti-SLAPP statute. *See* Mass. Gen. Laws ch. 231, § 59H ("If the court grants such special motion to dismiss, the court **shall** award the moving party costs and reasonable attorney's fees, including those incurred for the special motion and any related discovery matters.") (emphasis supplied).

## FACTUAL BACKGROUND

NESN incorporates by reference all factual allegations in its First Amended Complaint, Dkt. No. 12, and the Affidavit of Mary Breiter, Dkt. No. 3. On April 11, 2021, Legassa created a shell company, "Alley Interactive LLC" of Connecticut ("Alley CT"), for the purpose of defrauding NESN and improperly diverting funds from NESN to Alley CT. Dkt. No. 12 ¶¶ 15, 33, 41. In total, Legassa embezzled at least $575,000. *Id.* ¶ 45. The Federal Bureau of Investigation later corroborated these allegations, as reflected in the sworn Affidavit of Brendan Donlan, filed with the Criminal Complaint that resulted in Legassa's arrest on February 2, 2022 ("Donlan Affidavit"). *United States v. Ariel Legassa*, Criminal Action No. 22-CR-10038 (D. Mass. Feb. 17, 2022). As security for his bond, Legassa posted title to two cars (at least one of which, according to the FBI Affidavit, was paid for with funds embezzled from NESN) and his private airplane. *Id.* at Dkt. No. 20; Donlan Aff. ¶ 23. Legassa was indicted by a Grand Jury on February 17, 2022. *United States v. Ariel Legassa*, Criminal Action No. 22-CR-10038 (D. Mass. Feb. 17, 2022).

Out of concern that Legassa would dissipate or conceal the stolen funds, NESN filed its initial complaint and moved for an *ex parte* order of attachment by trustee process on January 7, 2022, on funds held in the bank account associated with Alley CT. Dkt. Nos. 1, 2. This Court

allowed the motion on January 10, 2022.  Dkt. No. 7.

Upon discovering that shell company's account contained only $578.12, NESN sought another *ex parte* order to attach funds held in Legassa's account at American Broadcast Employees Federal Credit Union ("ABEFCU").  Dkt. No. 9.  This Court agreed that there was a clear danger that Legassa would dissipate or conceal the funds and that NESN had a reasonable likelihood of recovering judgment.  Dkt. No. 10.  These findings were amply supported by the Breiter Affidavit and have now been corroborated by the Donlan Affidavit, which notes that in addition to paying off his car loan and paying various credit cards with funds fraudulently obtained from NESN, Legassa had at various times wired approximately $156,000 to the ABEFCU account.  *See* Donlan Aff. ¶ 23.[1]

ABEFCU's counsel contacted NESN's counsel shortly after NESN served the Trustee Summons, confirming that it had attached $1,800 in an account held jointly by Legassa and his wife, Nilda Legassa ("Mrs. Legassa") (i.e., the account to which Legassa previously wired funds stolen from NESN),[2] but that Legassa transferred approximately $80,000 from that account to one exclusively in Mrs. Legassa's name shortly before ABEFCU received the Trustee Summons. Dkt. No. 12 ¶ 36.  In the wake of that fraudulent transfer, NESN amended its complaint to add Mrs. Legassa as a Defendant and obtained an *ex parte* order of attachment of her credit union account.  Dkt. Nos. 12, 13, 14.

In his Counterclaim, Legassa brings several fanciful allegations against NESN and its executives.  First, he alleges that he was so important to NESN that its CEO and CFO skirted every internal policy and authorized him to establish a shell company to receive payments from

---

[1] The FBI's investigation turned up at least one other bank account exploited by Legassa in furtherance of his crimes.

[2] See Indictment ¶ 20, *United States v. Ariel Legassa*, Criminal Action No. 22-CR-10038 (D. Mass. Feb. 17, 2022).

NESN.[3]  The Counterclaim does not explain why the shell company had the same name as a legitimate NESN vendor or why he copied that vendor's logo and invoices.

Legassa also claims that, using NESN's money, he was creating a "white label" direct-to-consumer technology that could be sold to other regional sports networks.  He imagines that, even in the fictional world of the Counterclaim, he would have somehow personally benefitted from selling this product, which he claims he created at NESN's instruction with NESN's money.  Dkt. No. 35 ¶¶ 30–33.  He claims that he was fired as a pretext to deprive him of this financial windfall.  *Id*. ¶ 36.

But there's more.  Legassa also claims that he was fired because he is a person of color, including defamatory claims about Sean McGrail, NESN's CEO, and Raymond Guilbault, its CFO.  *Id*. ¶¶ 39–40.  Conceding that his own position as a member of the senior management team undercuts his claims of race-based animus, he tries to latch on to claims of another unnamed employee who he believes was denied a promotion because of their race.[4]

Based on his threadbare allegations, Legassa brings claims against NESN, McGrail, and Guilbault for Wrongful Termination, Violation of his Civil rights under Title VII and Mass. Gen. Laws ch. 151B, Hostile Work Environment, Abuse of Process, and both Intentional and Negligent Infliction of Emotional Distress.  NESN denies every allegation in the Counterclaim, which should be dismissed in its entirety.

## ARGUMENT

### I.     Legassa's Employment-Based Claims Fail to State Actionable Claims.

---

[3] When interviewed about Alley CT on the day of his termination, Legassa claimed the company was created to hire freelance engineers who he was unable to name.  That lie has now been replaced by the novel fabrications in the counterclaim.

[4] In an attempt to buttress his racial animus claims, Legassa gratuitously includes a suggestion that he was discriminated against for having tattoos.  Dkt. No. 35 ¶ 47.  Aside from the fact that this claim, like his others, is entirely made up, the law affords no special protection to people with tattoos.

Legassa's employment-based claims fail for a variety of reasons, not the least of which is that the Counterclaim includes only threadbare allegations and admits on its face that Legassa failed to pursue the statutory prerequisites to suit. As a threshold matter, parties cannot maintain actions under Title VII against individual defendants. *See Fantini v. Salem State College*, 557 F.3d 22, 29–31 (1st Cir. 2009) (collecting cases and holding that there is no individual employee liability under Title VII). The Court must therefore dismiss Legassa's Title VII claims against Sean McGrail and Ray Guilbault.

A. <u>Legassa's Wrongful Termination Claim (Count One) Fails to State a Claim.</u>

Legassa's Wrongful Termination Count claims that he was fired "in bad faith and with the intent to benefit financially at Legassa's expense," Dkt. No. 35 ¶ 50. It asserts baldly and without explanation that his termination was "in violation of public policy." *Id.* ¶ 49. Legassa was an employee at-will and could be terminated at any time with or without cause.[5] The only cause of action recognized under Massachusetts law for wrongful termination is when the termination "violates a clearly established public policy." *King v. Driscoll*, 638 N.E.2d 488, 492 (Mass. 1994). The Supreme Judicial Court "consistently has interpreted the public policy exception narrowly." *Id.*

Legassa's Wrongful Termination claim does not plead the existence of any recognized public policy exception to the general rule that at-will employees may be terminated for any reason or no reason at all. *See Kun v. KinderCare Education LLC*, 258 F. Supp. 3d 221, 226 (D. Mass. 2017). In order to state a claim for wrongful termination in violation of public policy, the public policy must be "well-defined" or "clearly established." *Id.* (quoting *Rodio v. R.J.*

---

[5] Because NESN employed Legassa, and NESN terminated him, the counterclaim fails to state any claim against McGrail or Guilbault, and at a minimum must be dismissed as to them.

*Reynolds Tobacco Co.*, 416 F. Supp. 2d 224, 232–33 (D. Mass. 2006)). "While there is no bright line between protected and non-protected actions, redress is available for employees who are terminated for asserting a legally guaranteed right, for doing what the law requires, or for refusing to do that which the law forbids." *Id.* (citing *Rodio*, 416 F. Supp. 2d at 236).

Legassa alleges only that NESN wrongfully terminated him in bad faith and with the intent to benefit financially at Legassa's expense. Dkt. No. 35 ¶ 50. It is unclear from Legassa's conclusory allegations how NESN would benefit financially from his termination; however, the Court need not inquire into that allegation at this stage—Legassa's pleadings simply fail to state an actionable wrongful termination because it does not identify any—much less a "well-defined" or "clearly established"—public policy that NESN or its executives violated. *Kun*, 258 F. Supp. 3d at 226 (quoting *Rodio*, 416 F. Supp. 2d at 232–33; *see also Cort v. Bristol-Myers Co.*, 431 N.E.2d 908, 911 (Mass. 1982)) (declining to impose liability for wrongful termination in violation of public policy "simply because [the employer] gave a false reason or a pretext for the discharge of an employee at will.").

To the extent that Count One incorporates by reference Legassa's claims of racial animus and makes that the basis for a public policy exception, it is preempted by his premature claim under Chapter 151B. "Massachusetts courts have repeatedly held that Chapter 151B is the exclusive remedy under state law for employment discrimination claims." *Ahanotu v. Massachusetts Turnpike Authority*, 466 F. Supp. 2d 378, 390 (D. Mass. 2006) (dismissing a claim for wrongful discharge in violation of public policy) (citing *Green v. Wyman-Gordon Co.*, 664 N.E.2d 808, 812–13 (Mass. 1996)). "The cause of action for wrongful termination in violation of public policy does not apply where 'there is a comprehensive remedial statute, [and] the creation of a new common law action based on the public policy expressed in that statute

would interfere with that remedial scheme.'"  *Welch v. People's United Bank, Nat'l Ass'n*, 2021 WL 1391467, at *5 (D. Mass. Apr. 13, 2021) (quoting *Perez v. Greater New Bedford Vocational Tech. Sch. Dist.*, 988 F. Supp. 2d 105, 113 (D. Mass. 2013)) (citations omitted).

      B.      Counts Two and Three Fail to State a Claim and Concede That Legassa Did Not <u>Exhaust Administrative Remedies.</u>

Legassa concedes that his discrimination claims under both Title VII and its Massachusetts analogue statute ("Chapter 151B") require administrative exhaustion and that he has not fulfilled that requirement.  Dkt. No. 35 at n. 1.  Notwithstanding his argument that his "civil rights claims arguably arise from" his termination and that he "arguably must bring them now," the law clearly requires dismissal because exhaustion is not a parallel requirement, it is a prerequisite to suit.

      1.      *Legassa Must Exhaust Administrative Remedies as a Prerequisite to Suit.*

"Both Title VII and Chapter 151B require an employee to exhaust the administrative process before filing a civil suit in court, and failure to do so normally precludes the filing of that claim."  *Posada v. ACP Facility Servs., Inc.*, 389 F. Supp. 3d 149, 158 (D. Mass. 2019) (citing *Jorge v. Rumsfeld*, 404 F.3d 556, 564 (1st Cir. 2005) and *Everett v. 357 Corp.*, 904 N.E.2d 733, 746–47 (Mass. 2009)).  "The purpose of that requirement is to provide the employer with prompt notice of the claim and to create an opportunity for early conciliation."  *Fantini v. Salem State College*, 557 F.3d 22, 26–27 (1st Cir. 2009) (discussing the purpose of Title VII's administrative exhaustion requirements); *see also Everett*, 904 N.E.2d at 746 (discussing the purpose of Chapter 151B's administrative exhaustion requirements).

Exceptions to this rule are limited and not presented here, such as where a court finds that the exhaustion requirement is subject to estoppel and equitable tolling.  *See, e.g., Posada*, 389 F. Supp. 3d at 158; *Vera v. McHugh*, 622 F.3d 17, 29–30 (1st Cir. 2010); *Everett*, 904 N.E.2d at

746, n. 21 (failure to file a timely charge is subject to equitable remedies, but "[w]here the issue is the absolute failure to file a charge, the defect precludes a court from exercising jurisdiction over any subsequent lawsuit alleging discrimination under [Chapter 151B]."). These limited exceptions "are to be applied sparingly," and courts in the First Circuit take "a narrow view of equitable exceptions to Title VII exhaustion requirements." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Frederique-Alexandre v. Dept. of Natural and Environmental Resources of Puerto Rico*, 478 F.3d 433, 440 (1st Cir. 2007). Legassa makes no attempt to plead the existence of any exception; nor could he, as even the scant allegations in the Counterclaim asserting racial animus describe events that took place long before (and unrelated to) his termination.[6]

Legassa argues in note 1 that his claims are compulsory counterclaims and he therefore must bring them now. First, this is not a recognized exception to the exhaustion rule. Moreover, a compulsory counterclaim is one that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim," Fed. R. Civ. P. 13(a)(1)(A), a description that does not fit the counterclaims. Claims that are not compulsory are permissive. Fed. R. Civ. P. 13(b).

Legassa's counterclaims are patently permissive. NESN's claims against him sound in fraud, conversion, unfair and deceptive business practices, and fraudulent transfer. Dkt. No. 12 ¶¶ 37–55. By contrast, Legassa's counterclaims are attempts to rewrite the narrative surrounding his fraud by alleging that he was subject to discrimination while employed by NESN—a claim wholly unrelated to the embezzling scheme outlined in the First Amended Complaint.

---

[6] Legassa initially makes no specific factual allegation that connects his own termination to his race. *See* Dkt. No. 35. Instead, he pleads that he is Latino (¶ 53), that he was terminated (¶ 55), and that he believes NESN intends to "fill his position by hiring someone with qualifications similar to Legassa's." (¶ 56). This last allegation is both unremarkable and is quite possibly the only true allegation in the Counterclaim. He does not suggest, even on "information and belief," and it is not the case, that NESN's search for a replacement who will not steal from it is limited in any way by race, gender, sexual orientation, or any other factor. His allegations that he was terminated because of his race (¶¶ 57–58) are unadorned with any specifics and merely parrot the statutory language.

NESN's claims and Legassa's counterclaims are based on different facts and different law. Res judicata would not bar a suit on Legassa's counterclaims because the resolution of NESN's claims would not reach the merits of Legassa's employment-related allegations. Different evidence would be used to prove each party's claims, with NESN focusing on the evidence related to the fraudulently submitted invoices and Legassa focusing on circumstances of his employment *separate* from the embezzling scheme. Lastly, there is no logical relation between NESN's fraud-focused claims and Legassa's discrimination-focused claims. Legassa's counterclaims are permissive counterclaims, and the Court should not accept his arguments to the contrary. *Iglesias v. Mut. Life Ins. Co. of New York*, 156 F.3d 237, 241 (1st Cir. 1998) (abrogated on other grounds); *Laddawn, Inc. v. Bolduc*, 2018 WL 7047647, at *5 (D. Mass. Dec. 27, 2018).

No circumstances or allegations in Legassa's counterclaim excuse his failure to exhaust administrative remedies. Legassa made no effort at all to raise any employment discrimination claim against NESN until he brought his counterclaims in this litigation. This Court should not stray from the practice of taking "a narrow view of equitable exceptions to Title VII exhaustion requirements," which here were raised only in a footnote, and should dismiss Counts II and III of the Counterclaim. *Frederique-Alexandre*, 478 F.3d at 440.

      2.    *Counts Two and Three Also Fail to State Actionable Claims.*

Legassa's Title VII and Chapter 151B claims are also improperly pled and fail to adequately state a claim for relief under those statutory frameworks. Under Title VII, the complaint must contain facts that indicate a relationship between the plaintiff's protected characteristic, such as race, and the adverse employment action taken against the plaintiff. *Alicea v. North American Central School Bus, LLC*, 232 F. Supp. 3d 213, 215 (D. Mass. 2017).

"It is not enough to allege, without more, that the plaintiff is a member of a protected class and that she was fired, or even that she was fired unfairly." *Id.* "Put simply, the complaint has to allege a plausible basis for a claim of discrimination, not just unfair treatment." *Id.*

Legassa's allegations do not connect his protected characteristic to an adverse employment action. Legassa establishes that he is Latino and that he was terminated. But Legassa alleges a purely non-discriminatory reason for his firing. *See* Dkt. No. 35 ¶ 3 ("Legassa's termination is an effort by Counterclaim Defendants to get rid of Legassa before the launch of NESN's DTC technology and before Legassa could finish developing the white label DTC product and share in the profits from it."). Indeed, Legassa notes that he was hired in a senior position of trust at NESN. *Id.* ¶¶ 8–9. Legassa alleges various instances of inappropriate comments directed toward others, not him, during his employment at NESN, but he does not even suggest these allegations relate to his termination.

The Chapter 151B claims should face the same fate for the same reasons. "In a [Chapter 151B] racial discrimination case, the plaintiff has the burden of persuading the fact finder that the employer intentionally discriminated against him or her on account of race, and that the defendant would not have taken the action taken 'but for' the unlawful discrimination." *McKenzie v. Brigham & Women's Hospital*, 541 N.E.2d 325, 327 (Mass. 1989) (internal citations omitted). Legassa fails to plead that NESN would not have taken action but for his being a member of a protected class, and he instead provides a non-discriminatory allegation as to why he was terminated. And even if Legassa could meet this burden, it is clear that NESN terminated him immediately after it discovered that he had embezzled hundreds of thousands of dollars, not because he is a member of a protected class.

Legassa likewise cannot maintain his hostile work environment claims under Title VII or

Chapter 151B. Under both state and federal law, Legassa must show "(1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome [racial] harassment; (3) that the harassment was based upon [race]; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that [racially] objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established." *Posada*, 389 F. Supp. 3d at 157 (citing *Ponte v. Steelcase, Inc.*, 741 F.3d 310, 320 (1st Cir. 2014)). "Determining whether a work environment is hostile requires a fact-specific analysis of the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Dexter v. Dealogic, LLC*, 390 F. Supp. 3d 233, 242 (D. Mass. 2019) (citing *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 180 (1st Cir. 2008)).

Legassa's allegations do not establish colorable hostile work environment claims under this framework. Legassa proffers general allegations that (variously) are speculative, do not involve him, and are pled merely on information and belief of offensive jokes and comments he attributes to NESN executives. *See, e.g.*, Dkt. No. 35 ¶¶ 41–43. He alleges that he "never really felt like he belonged" at NESN. *Id.* ¶ 45. This is simply not the kind of hostility courts recognize as actionable. *Pelletier v. Town of Somerset*, 939 N.E.2d 717, 731 n.32 (Mass. 2010) ("[a] hostile work environment is one that is so 'pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization' that it 'poses a formidable barrier to the full participation of an individual in the workplace,'") (quoting *Cuddyer v. Stop & Shop Supermarket Co.*, 750 N.E.2d 928, 937 (Mass. 2001)).

## C. Legassa's Emotional Distress Claims (Counts Five and Six) Are Equally Untenable.

Legassa fails to plead cognizable claims for intentional and negligent infliction of emotional distress, which in all events are firmly preempted by the Massachusetts Worker's Compensation Act (the "WCA"). *See, e.g.*, Mass. Gen. Laws ch. 152 § 24; *McCarty v. Verizon New England, Inc.*, 731 F. Supp. 2d 123, 131 (D. Mass. 2010) ("It is well settled law that actions for negligent and intentional infliction of emotional distress against an employer are barred by the exclusivity clause of the [WCA]."); *O'Connor v. Jordan Hosp.*, 2012 WL 1802308 at *11 (D. Mass. May 16, 20212) (claims for negligent and intentional infliction of emotional distress are personal injuries within the meaning of the WCA). The WCA's exclusivity provision applies to any injury that arises out of the employment relationship, regardless of whether the injury occurs during the precise period of employment. *Andersen v. Diorio*, 349 F.3d 8, 16 (1st Cir. 2003) (citations omitted).

### 1. *If Not Preempted, Count Five Fails to State a Claim.*

In order for Legassa's intentional infliction of emotional distress counterclaim to survive a motion to dismiss, he must plead: "(1) that [the Counterclaim Defendants] intended, knew, or should have known that [their] conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." *Polay v. McMahon*, 10 N.E.3d 1122, 128 (Mass. 2014). "The standard for making a claim of intentional infliction of emotional distress is very high." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 195 (1st Cir. 1996) (citing *Agis v. Howard Johnson Co.*, 355 N.E.2d 315, 318–19 (Mass. 1976)). "[L]iability cannot be predicated upon 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities,' nor even is it enough 'that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional

distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort'; rather, '[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Foley v. Polaroid Corp.*, 508 N.E.2d 72, 82 (Mass. 1987) (quoting Restatement (Second) of Torts § 46 (1965)).  "A judge may grant a motion to dismiss where the conduct alleged in the complaint does not rise to this level." *Polay*, 10 N.E.3d at 1128–29 (citing *Beecy v. Pucciarelli*, 441 N.E.2d 1035, 1040 (Mass. 1982)).

Legassa's allegations do not rise to the level of extreme and outrageous behavior necessary to sustain a claim for intentional infliction of emotional distress.  Even taken as true, Legassa's firing from NESN for embezzling hundreds of thousands of dollars does not "rise[] to the exceptionally high standard required to qualify as extreme and outrageous." *Soni v. Wespiser*, 239 F. Supp. 3d 373, 390 (D. Mass. 2017) (finding that allegations of a defendant calling the plaintiff's prospective employers to spread "vicious lies" about her because she is a woman and a racial minority that cost the plaintiff two jobs failed to state a claim for intentional infliction of emotional distress under Massachusetts law).  Legassa failed to plead facts that demonstrate extreme and outrageous behavior, and he has therefore failed to plead an actionable claim for intentional infliction of emotional distress.

        2.       *Count Six Does Not Even Plead All the Elements.*

Legassa's negligent infliction of emotional distress claim is similarly deficient and should be dismissed.  "A claim for negligent infliction of emotional distress has five elements: '(1) negligence; (2) emotional distress; (3) causation; (4) physical harm; and (5) that a reasonable person would have suffered emotional distress under the circumstances.'" *Elliott-Lewis v. Abbott*

*Laboratories*, 378 F. Supp. 3d 67 (D. Mass. 2019) (quoting *Alicea v. Commonwealth*, 993 N.E.2d 725, 730 n.9 (2013)). Negligence is a threshold requirement to make out a claim for negligent infliction of emotional distress. *Galvin v. U.S. Bank, N.A.*, 852 F.3d 146, 161 (1st Cir. 2017). Conclusory assertions of harm do not suffice to state a claim—allegations that a plaintiff "fell ill" or that a plaintiff suffered physical harm resulting in "objective symptomology" do not meet requisite pleading requirements and are inadequate as a matter of law. *See Gindi v. Norton*, 216 F. Supp. 3d 199, 206 (D. Mass. 2016).

Legassa's claim falls short on both fronts: he both fails to properly allege negligence and fails to allege any real damages. Legassa alleges that NESN, McGrail, and Guilbault owed him a "duty of care not to wrongfully [engage in different intentional torts]," and breached those duties by "engaging in all of the wrongful conduct described in [the] Counterclaim." Dkt. No. 35 ¶¶ 74, 75. Legassa similarly alleges that he "has suffered and continues to suffer emotional distress and physical harm manifested by objective symptomatology." *Id.* ¶ 77. The Court need not accept these conclusory, generalized allegations that do not adequately plead what is required under the law. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (citations omitted); *see also Gindi*, 216 F. Supp. 3d at 206. Legassa has failed to state claims for intentional and negligent infliction of emotional distress, and the Court should accordingly dismiss these counterclaims.

D.  Legassa's Abuse of Process Counterclaim Four Is a Frivolous Attempt to Chill NESN's Rights to Pursue Relief from This Court.

Legassa, through his attorney, has now filed a number of counterclaims against NESN and its executives that are without any legal or factual merit. Pursuant to the Massachusetts anti-SLAPP statute, NESN hereby brings a special motion to dismiss those counterclaims that are based on NESN's exercise of its constitutional right to petition. *See* Mass. Gen. Laws ch. 231

§ 59H.  "The anti-SLAPP statute provides 'a quick remedy for those citizens targeted by frivolous lawsuits' based on [its petitioning activities]." *Riverdale Mills Corp. v. Cavatorta North America, Inc.*, 189 F. Supp. 3d 317, 324 (D. Mass. 2016) (quoting *Kobrin v. Gastfriend*, 821 N.E.2d 60, 63 (Mass. 2005)).  Courts in this Circuit have considered the Massachusetts anti-SLAPP statute as substantive and therefore applicable in federal court, at least with respect to state claims.  *See, e.g., Bargantine v. Mechanics Co-op. Bank*, 2013 WL 6211845, at *3 (D. Mass. Nov. 26, 2013); *Jobs First Independent Expenditure Political Action Committee v. Coakley*, 2016 WL 6661142, at *3 (D. Mass. Nov. 10, 2016) (acknowledging *Bargantine* but declining to apply Massachusetts' anti-SLAPP statute to federal claims).

NESN must first demonstrate "that the plaintiff's claims are based on 'petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities.'" *Wenger v. Aceto*, 883 N.E.2d 262, 266 (Mass. 2008) (quoting *Duracraft Corp. v. Holmes Products Corp.*, 691 N.E.2d 935, 943 (Mass. 1998)).  "The focus of this inquiry is solely on the conduct complained of in the lawsuit." *Riverdale Mills Corp.*, 189 F. Supp. 3d at 324 (citing *Cadle Co. v. Schlichtmann*, 859 N.E.2d 858, 864 (Mass. 2007)).  There is no question that NESN filing this complaint is qualified, protected petitioning activity within the meaning of the anti-SLAPP statute.  *477 Harrison Ave., LLC v. JACE Boston, LLC*, 134 N.E.3d 91, 99 (Mass. 2019) ("Commencement of litigation is quintessential petitioning activity.") (collecting cases).  Legassa's abuse of process claim complains solely about a protected petitioning activity—the filing of this lawsuit.  NESN has a right to petition this Court for redress of its legitimate claims, and the anti-SLAPP statute demands that the abuse of process claim be dismissed and that NESN be awarded reasonable attorneys' fees.

Moreover, Legassa's abuse of process claim should be dismissed under Rule 12(b)(6) for

failure to state a claim. To state a claim for abuse of process, Legassa must allege that "(1) process was used, (2) the use was motivated by an ulterior purpose, and (3) the plaintiff suffered damage." *Children's Hospital Corp. v. Cakir*, 183 F. Supp. 3d 242, 249 (D. Mass. 2016) (citing *MHA Fin. Corp. v. Varenko Invs. Ltd.*, 583 F. Supp. 2d 173, 178 (D. Mass. 2008)) (citations omitted). "The tort has been described as usually involving a 'form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money.'" *Keystone Freight Corp. v. Bartlett Consol., Inc.*, 930 N.E.2d 744, 751 (Mass. App. Ct. 2010) (quoting *Vittands v. Sudduth*, 730 N.E.2d 325, 332 (Mass. App. Ct. 2000)). Indeed, "the gravamen of an abuse of process claim is whether the defendant had an ulterior motive." *Humphrey v. Comoletti*, 2017 WL 1224539, at *4 (D. Mass. Mar. 31, 2017).

Like his other counterclaims that merely recite the elements of the cause of action at common law in a conclusory fashion, Legassa's abuse of process counterclaim fails to plead or identify an ulterior motive—it simply alleges that NESN used process that "seeks an ulterior or illegitimate purpose, which has caused Legassa to sustain damages; and/or [ ] is intended to coerce and obtain a collateral advantage not properly involved in that law suit [sic]." Dkt. No. 35 ¶ 66. Nowhere in Legassa's counterclaim does he allege *why* NESN filed suit for an improper purpose, nor does he allege *what* the improper purpose is. He similarly fails to allege any sort of tangible damages. *See Cakir*, 183 F. Supp. 3d at 250 (finding that the plaintiff failed to plead a claim for abuse of process, in part because of a conclusory allegation that he suffered "damage."). Legassa's claim for abuse of process is both frivolous and defective, and it should be dismissed.

## CONCLUSION

For the forgoing reasons, NESN respectfully requests that the Court enter an Order:

a) Dismissing the Counterclaim in its entirety;

b) Awarding NESN, McGrail, and Guilbault reasonable attorneys' fees in connection with this Motion; and

c) For other such relief as the Court deems right and just.

Respectfully Submitted,

NEW ENGLAND SPORTS NETWORK, L.P., SEAN MCGRAIL, AND RAYMOND GUILBAULT,

Dated: March 25, 2022

By Their Attorneys,

*/s/ Christopher M. Morrison*
Christopher M. Morrison (BBO # 651335)
cmorrison@jonesday.com
Jacob E. Morse (BBO # 709512)
jacobmorse@jonesday.com
JONES DAY
100 High Street
21st Floor
Boston, MA  02110.1781
Telephone:   +1.617.960.3939
Facsimile:    +1.617.449.6999

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, on March 25, 2022, the foregoing was filed through the Court's ECF system and will be sent electronically to the registered participants.

<u>*/s/ Christopher M. Morrison*</u>